THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOEL C. HICKOX, Defendant-Appellant.

Second District   No. 2—88—0828

Opinion filed April 26, 1990.

G. Joseph Weller and Beth Katz, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Colleen M. Griffin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Defendant, Joel Hickox, was found guilty of two counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, par. 12—16(b)) and three counts of criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(3)) after a bench trial. Defendant appeals his convictions, raising the following issues: (1) whether he was proved guilty beyond a reasonable doubt when the complaining witness had retracted her claim and was known to exaggerate and make up stories; and (2) whether the trial court improperly based its decision on an expert witness' opinion of the complainant's credibility.

Defendant was charged by indictment with committing acts of sexual conduct and penetration with his minor daughter, K. At the trial on January 28, 1988, K. stated that she was eight years old and in the second grade. After the court found her competent to testify, K. stated that when she was five years old she lived in Bloomingdale with her mother, Joan. Defendant would sometimes visit K. on Fridays. K. explained that her birthday is December 21 and that, sometime around her fifth birthday, she and defendant were alone at K.'s house. Defendant called her into the bathroom. K. went in and saw defendant going to the bathroom. Defendant told K. to touch his penis, which she did.

K. then testified about another incident. She and defendant were home alone. K. was in the bathtub taking a bath when defendant came into the bathroom. Defendant then "scratched" her when he touched her "privates." K. further testified about a third incident which occurred in the spring. K. was home alone with defendant. They were in the living room "playing doctor." K. was lying on her back on the couch. Defendant was sitting on the couch wearing only a shirt. K. stated that she did not remember what else happened. The court then questioned K. about the incident. K. answered that they only "played doctor" that one time. In response to the court's questioning, K. indicated that she had touched defendant's penis and that defendant had touched her vagina with his hand.

The prosecutor then resumed her examination. K. testified that in the summer, when she was five years old, she was again home alone with defendant. K. was doing cartwheels and handstands in the living room when defendant pulled down her pants and touched K.'s vagina with his hand and his mouth. Defendant also had K. put her mouth on defendant's penis. Defendant told K. not to tell anyone about what happened and that K. "would have a problem" and would get her mouth washed out with soap. K. did not tell anyone about these incidents until a local group put on a safety program at K.'s school. K.

told one of the members of the group that defendant sexually abused her. K. then told her kindergarten teacher and the school principal.

On cross-examination, K. first denied having talked about the incidents with her mother, then explained that she talked to her mother about some of it after the safety program at school. K. denied that there was any sexual contact between herself and defendant before she was five years old. At the time the incidents occurred, a person named Beatrice was baby-sitting for K. K. testified that she had not seen defendant for one year and would like him to visit her "as soon as he gets help."

Defense counsel then questioned K. about her visits with a psychologist, Dr. Thomas Phelan. K. denied that she told Dr. Phelan that she was "not sure" that defendant abused her and further denied that she said to Dr. Phelan about defendant, "maybe he did it and maybe he did not." K. also denied that she ever told anyone that the abuse did not happen.

Although on direct examination K. testified that defendant "scratched" her when he touched her vagina, K. explained that a physician told K. that she had a scratch on her which was caused by defendant touching her vagina. The court asked K. about the touching, and she indicated that she felt his finger inside her, but she did not remember feeling any pain. K. further indicated that what she told the person from the safety program was the same as her testimony in court. The court then asked if everything to which she had testified was the truth, and K. answered yes. K. also denied that any part of the testimony was made up or imagined or thought up because of the safety program.

Diana Bloem testified that in March 1986 she was working for the child assault prevention program (child safety program), which she described as a team of three women who went to schools to present a safety program to the children. On March 10, 1986, Bloem and her team put on a program for K.'s kindergarten class. As part of the program, Bloem presented a skit which dramatized a situation where a child is subjected to "bad touching." In the skit, an adult relative sits close to the child, rubs her arm, or brushes her hair while telling her how grown up she is. Then the adult asks the child for a kiss, but the child does not want to kiss the adult. Eventually, the child kisses the adult on the cheek, and he tells the child "this is our secret" and do not tell anyone. After presenting this program to K.'s class, the team told the children that if they had questions, they could speak with the team members individually. Bloem talked with K. Bloem testified that K. "identified a person as having touched her in a private

place[ ]." Bloem then advised K.'s teacher and the school principal of K.'s revelation.

On cross-examination, Bloem explained that after presenting the skit, the team asked the children questions about the skit, such as "how do you think [the child in the skit] felt? Did she feel good or did she feel bad[?]" The team also asked the children for examples of good secrets and bad secrets. The team told the children "a bad secret is something that makes you feel really yucky inside."

Bloem elaborated on her individual meeting with K. Bloem asked K. to tell her about a picture that K. had drawn. K. was telling Bloem about the picture when, suddenly, K. said "my daddy touches me in private places" and that "it made her feel yucky" when he did that. K. did not want Bloem to tell anyone about what happened. K. then abruptly changed the subject.

Joan Evans, K.'s mother, testified that K. was born on December 21, 1979. Joan and defendant's marriage was dissolved in December 1981, and Joan remarried in 1986. Joan was living in Bloomingdale when the alleged offenses occurred, and she subsequently moved out of the State with her new husband and K. When Joan and defendant's marriage broke up, they had agreed on a liberal visitation between defendant and K. Joan retained custody of K. Defendant visited K. at Joan's home in Bloomingdale approximately twice per month. Defendant stayed at the house while he was visiting. Joan was usually not around when defendant came to visit, but the live-in babysitter would often be in the house.

Joan further testified that on March 14, 1986, the principal of K.'s school called Joan and asked her to come to the school. Joan went to see the principal and there met two women from the child safety program. They informed Joan that K. told them she had been abused.

Detective Scott Stick of the Bloomingdale police department testified that in December 1986 he began investigating K.'s allegation of abuse. In January 1987, Detective Stick interviewed K. Through the use of anatomically correct dolls, K. explained to Detective Stick that at her home "an individual" called K. into the bathroom and asked her to touch and rub his penis. Another time, while being given a bath, "an individual" touched K.'s vaginal area. K. also described to Detective Stick an incident where "an individual" asked her to "play doctor." The person then had K. perform oral sex on him. K. also related to Detective Stick another incident when K. was doing gymnastics in her living room and "an individual" came up to her, pulled down her pants, put his finger in her vagina and then placed his tongue on her vagina.

The State's next witness, Dr. Mireille Kanda, was qualified to testify as an expert in pediatric medicine and child sexual abuse. Dr. Kanda testified that she examined K. in March 1987. Joan told Dr. Kanda that K. had been sexually abused from the age of three until March 1986. In addition, Joan told Dr. Kanda that K. masturbated frequently and had been complaining of genital itching for three years. K. also told Dr. Kanda that defendant had touched K.'s genitalia.

During her physical examination of K., Dr. Kanda found two scars in K.'s vaginal area and labial fusion, which is an abnormal finding in a child of K.'s age. Dr. Kanda testified that this labial fusion is an indication of trauma to the area. Dr. Kanda also noted that the edge of K.'s hymen was rounded. According to Dr. Kanda, sometimes after a trauma, the edge of the hymen becomes rounded. Dr. Kanda stated that the scars were evidence of trauma to the genital area, which is not normal in children. In Dr. Kanda's opinion, the scars could not have been self-inflicted during masturbation. Dr. Kanda concluded that the evidence of trauma she found was consistent with sexual abuse.

Dr. Kanda stated that she could not determine when the trauma which caused the scars occurred. Dr. Kanda admitted that it was possible that masturbation could have caused the evidence of trauma to the area. Dr. Kanda had been told that K. was seen trying to use a carrot to masturbate and that K. frequently masturbated. Dr. Kanda explained that witnessing sexual activity would not cause a child to masturbate if the child did not understand the sexual connotation of the activity. Dr. Kanda also stated that many sexually abused children exhibit symptoms of genital itching.

The defense called Dr. Thomas Phelan to testify as an expert in clinical psychology. Dr. Phelan was not an expert in child sexual abuse. Dr. Phelan testified that in March 1986 Joan requested that he examine K. because Joan was concerned that K. might have been sexually abused by defendant. Joan was confused and did not know whether to believe defendant or K. Joan told Dr. Phelan that K. was "prone to exaggeration" and made up stories that were not true. Dr. Phelan also collected information from K.'s maternal grandparents. They said that K. could not be trusted and that she was often rude, impulsive, and unpredictable.

Dr. Phelan interviewed K. three times, each meeting lasting between 15 and 20 minutes. Dr. Phelan described K. as restless and anxious and that she made inappropriate and overly friendly remarks. K. told Dr. Phelan that she liked him and that she thought he was

"cute." K. also wanted to sit physically close to Dr. Phelan. Dr. Phelan found K. to be "uninterviewable." When Dr. Phelan tried to question K. about the abuse, she gave a "smart aleck" response to the effect of "well maybe he [defendant] did and maybe he didn't" abuse her. K. also told Dr. Phelan that she was not sure if defendant abused her and that she lied and she had changed her mind.

Dr. Phelan diagnosed K. as suffering from attention deficit disorder. The disorder is characterized by difficulty in concentrating, distractibility, and a short attention span. Other symptoms include impulsivity, hyperactivity, emotional overarousal, social aggressiveness, and disciplinary problems. Dr. Phelan testified that the disorder "would make [K.] something of a less credible witness" and that if children suffering from the disorder do lie, it is "to cover up some things they have done." Dr. Phelan's conclusion that he could not trust what K. said was based both on the grandparents' and Joan's comments that K. was not credible and Dr. Phelan's opinion that she suffered from the disorder. Since children with the disorder "tend to be attention seeking, and often dramatic and hysterical," Dr. Phelan believed that viewing the child safety program caused K. to make false accusations.

Dr. Phelan also testified that Joan told him that K. had seen some of the live-in baby-sitters sunbathing topless and that K. told Joan that she had seen a landscaper on top of one of the baby-sitters, kissing her. Dr. Phelan admitted that lying is not a symptom of the disorder. In addition, there may be some overlap between the symptoms of the disorder and the indicia of sexual abuse; however, the two are not mutually exclusive. Dr. Phelan also admitted that he had not been able to rule out the possibility that K. had been sexually abused.

Dr. Mary Robinson testified that she was a clinical psychologist and K. was one of her patients. K. had been referred to Dr. Robinson by K.'s pediatrician, who thought K. needed therapy because she had been sexually abused. Before beginning sessions with K., Dr. Robinson met with Joan, who told Dr. Robinson that K. behaved seductively toward adult men.

Including the initial diagnostic sessions, Dr. Robinson had met with K. approximately 40 times at the time of trial. Dr. Robinson conducted four diagnostic sessions with K., each lasting approximately one hour, and Dr. Robinson was currently meeting with K. on a weekly basis for a one-hour session.

In the first diagnostic session, K. seemed tense, anxious, and agitated. While playing with anatomically correct dolls, K. told Dr. Robinson that defendant asked K. to touch his penis. During a subsequent diagnostic session, K. described in greater detail what hap-

pened. K. said to Dr. Robinson, " 'You will think it is gross.' " K. then related that defendant performed oral sex on her, and she did the same to him. In the last diagnostic session, K. demonstrated on the anatomically correct dolls what defendant had done to her. K. was "very distressed" while demonstrating with the dolls and went limp and collapsed on the floor.

Dr. Robinson opined that K.'s behavior and history demonstrated "classic" symptoms of sexual abuse. Dr. Robinson based that opinion on K.'s statements, her play with the dolls, her behavior and drawings, and her history, which Dr. Robinson characterized as consistent with sexual abuse. Dr. Robinson further explained that when K. talked about the incidents, she would complain of stomachaches and headaches, she would have difficulty talking about the incidents, she would become "exceedingly anxious" and would "grasp the front of her dress over her genital area." In addition, K.'s history of seductive behavior toward men is indicative of sexual abuse because "when a child has been exposed to sexual activity with an adult, then the child tends to repeat this behavior."

Dr. Robinson further testified that K.'s failure to tell anyone what happened until after she saw the child safety program was also characteristic of a child who had been sexually abused. In addition, sexually abused children generally retract the allegation of abuse on at least one occasion out of fear of retribution, fear of appearing to be bad, fear of not being believed, and out of affection for the abuser. K.'s interest in masturbation was also consistent with having been the victim of sexual abuse. K. never named anyone other than defendant as having sexually abused her.

Dr. Robinson had seen Dr. Phelan's report in which he concluded that K. had not been abused, and Dr. Robinson explained that she did not contact Dr. Phelan because he had only seen K. on a few occasions for 20 minutes. Dr. Robinson did not contact K.'s grandparents, but did contact K.'s teachers when making her evaluation of K.

K. had told Dr. Robinson that she had been abused when she was four years old. K. had said that when it occurred, she felt terrible, scared, and worried. As part of a session, K. had made a clay figure. Robinson described it as looking "like a phallus." When K. made the phallus, she put it in the mouth of a puppet and said, "Suck on it." Also during a session, K. had a doll say, " 'Joel touched me and that he hurt me very bad.' " K. told Dr. Robinson that defendant warned K. that if she told anyone about what they did, K. would have a big problem. K. still loved defendant and expressed the fear that he would go to jail. According to Dr. Robinson, such mixed feelings are a

common characteristic of a child who has been sexually abused.

Dr. Robinson explained that merely witnessing sexual acts would not account for K.'s symptoms. Dr. Robinson had asked K. what she knew about sexual activity, and K. described only what happened with defendant. Dr. Robinson further explained that young children, such as K., are good at describing events, but they have difficulty placing those events in time. K. could not tell Dr. Robinson on which dates or during which months the incidents occurred, but K. was able to place them in terms of holidays.

Dr. Robinson testified that although K. tended to exaggerate, Joan did not say that K. made up stories. Rather, what Joan described to Dr. Robinson was "defensive lying," that is, when a child denies doing something that he or she has done.

The court then asked Dr. Robinson whether she had any techniques to determine whether a child is lying or whether a child is relating fantasies. Dr. Robinson answered that she uses her professional judgment to determine whether a child is lying and that she had never encountered a child of K.'s age who fantasized in detail about adult sexual activity who had not actually experienced it.

Defense counsel asked Dr. Robinson if she had ever dealt with a child who was coached and fabricated allegations of abuse. Dr. Robinson had encountered several children between the ages of 3 and 10 years old who had been coached. Dr. Robinson was able to detect the coaching in the diagnostic interviews based on the children's behavior. She stated that the history of the child is not important when determining whether a child has been coached because often the person who provides the history is the one who coached the child to make the allegations. Dr. Robinson opined that K. had not been coached and that she had not made up the allegations.

Beatrice Davis testified on defendant's behalf. Davis was employed as a live-in baby-sitter by Joan from October 1984 to June 1985. Davis testified that defendant visited them during Christmas time in December 1984 and left on December 26, 1984. He did not return until the beginning of February 1985. Davis was usually home on the weekends that defendant was in town. According to Davis, K. was always happy and excited to see defendant. Defendant wrote K. letters and talked to her on the telephone. Davis never noticed anything unusual whenever she walked in on defendant and K. Davis admitted that there were many occasions when defendant was at the house with K. when Davis was not there.

Jeffery Feingold testified that he dated Joan between December 1984 and July 1985. During this time, Feingold saw K. at least three

days per week. Feingold described K. as "hyper" and uncontrollable. According to Feingold, K. "would make up stories *** as any little child might, she would say things that some one told her, something [that] had turned out not to be true."

Defendant testified that in 1984 he had Christmas dinner at Joan's house and then he left the next day. The next time defendant visited was in February 1985. Davis was usually there when defendant visited, although several times defendant was alone with K. Defendant denied that he ever had any sexual contact with K. He had given her baths and dried her off. Defendant also denied that he ever threatened K. if she accused him of sexually abusing her.

In finding defendant guilty on all counts, the court specifically stated that K.'s testimony was credible. In addition, the court found that her testimony was independently corroborated, there was no evidence that K. was coached, or that her testimony was the result of fabrication or suggestion.

Defendant first contends on appeal that he was not proved guilty of sexually abusing K. beyond a reasonable doubt. When a reviewing court is asked to overturn a conviction based on the sufficiency of the evidence, the court must consider whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) Defendant argues that K. was not a credible witness and that there was no evidence to corroborate her allegations.

A conviction of sexual abuse will be upheld where the complainant's testimony is clear and convincing or independently corroborated. (*People v. Avila* (1989), 180 Ill. App. 3d 345, 350.) Testimony is clear and convincing if the complainant's testimony is consistent and the discrepancies, if any, do not detract from its reasonableness. (*People v. Escobedo* (1986), 151 Ill. App. 3d 69, 81.) The failure of a child witness to remember dates does not render the testimony unclear as a matter of law. (*People v. Morton* (1989), 188 Ill. App. 3d 95, 99.) A reviewing court will not substitute its judgment for that of the trier of fact. *Avila*, 180 Ill. App. 3d at 350.

We disagree with defendant's assertions that K.'s testimony should be discounted because she had a tendency to make up stories. Both Dr. Phelan and Dr. Robinson testified that K. lied to cover things up. Furthermore, Dr. Robinson testified that merely viewing sexual activity would not enable K. to fantasize in detail about sexual activity, and K.'s allegations are entirely different from the behavior shown in the skit from the child safety program.

We also do not agree with defendant's argument that because a length of time had passed between the date of the incidents and K.'s complaint, K.'s testimony is rendered unreliable. In *Avila*, the 16-year-old victim did not report that her stepfather sexually abused her until eight years after the abuse began. This delay did not damage the victim's credibility because when the abuse first began, the victim thought that the sexual conduct was normal. (*Avila*, 180 Ill. App. 3d at 351.) The victim here is even younger than the victim in *Avila* was at the time the sexual abuse began. The first time K. learned about "bad touches" in school, she reported the abuse.

K.'s remarks to Dr. Phelan that defendant may or may not have abused her do not diminish her credibility. Dr. Robinson testified that it is common for child sexual abuse victims to retract their allegations for a number of reasons. Furthermore, contrary to defendant's assertions, the evidence that K. suffered from attention deficit disorder does not render her testimony unbelievable. Dr. Phelan testified that a child with the disorder would appear less credible, not that such children are less credible because they lie. Lying is not a symptom of the disorder. Since the disorder and sexual abuse are not mutually exclusive, it is irrelevant whether K. does suffer from the disorder.

We also disagree with defendant's argument that there was no evidence to corroborate K.'s story. Dr. Kanda amply testified to the physical evidence of sexual abuse, and Dr. Robinson testified to the emotional evidence of sexual abuse. The trial court evidently believed the conclusions of these experts. Since the credibility of the witnesses is a matter for the trier of fact to resolve, we will not dispute its findings. *People v. Freeman* (1988), 167 Ill. App. 3d 740, 744.

The trial court believed K. and found her testimony to be genuine. K.'s account of the incidents of abuse never varied, and she testified in detail about each occurrence. The State offered the testimony of two experts and two witnesses to whom the child made her report. By contrast, defendant presented the testimony of an expert who could not rule out sexual abuse and who based his conclusion that the allegations were a product of K.'s imagination on three 20-minute interviews in which K. was "uninterviewable." The testimony of defendant's witnesses did not refute the allegations. Davis admitted that there were times when defendant was alone with K., and, according to K., the abuse occurred when no one else was home. Although Feingold testified that K. made up stories as any small child would, Dr. Robinson testified that children of K.'s age do not make up sexual fantasies unless they have experienced the acts. We therefore conclude that the State presented overwhelming evidence to prove be-

yond a reasonable doubt that defendant committed the offenses.

■■ ■ Defendant next contends that the trial court erred in considering Dr. Robinson's opinion of K.'s credibility. We note, however, that defendant neither objected to the court's questioning of Dr. Robinson at trial nor raised this matter in his post-trial motion. This issue is therefore waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186-88.) Defendant argues, however, that we should consider the issue as one of plain error.

A court will consider an issue as plain error only when the question of guilt is close and the error might have significantly affected the outcome of the case, or when the error is so substantial that it deprived a defendant of a fair trial. (*People v. Sanders* (1983), 99 Ill. 2d 262, 273.) As previously discussed, the evidence in this case is not closely balanced. In addition, this was a bench trial. Courts employ the plain-error exception to the waiver rule to correct any serious injustice which may have deprived a defendant of a fair trial, and because the exception is narrow and limited, it should not be applied in every case. (*People v. Sommerville* (1990), 193 Ill. App. 3d 161, 171.) The error of which defendant complains is not of such magnitude to require review of it as plain error.

The judgment of the circuit court is affirmed.

Affirmed.

UNVERZAGT, P.J., and GEIGER, J., concur.