574 N.E.2d 878 (1991)
215 Ill. App.3d 85
158 Ill.Dec. 765
In re CLARENCE T.B. et al., Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Clarence H.B. et al., Respondents-Appellants).
Nos. 2-90-0849, 2-90-0850, 2-90-0851 & 2-90-0852.
Appellate Court of Illinois, Second District.
June 20, 1991.
*879 Sreenan & Cain, P.C., Peter B. Nolte, Rockford, for Clarence Bashaw Sr., Jenny Bashaw.
Paul A. Logli, Winnebago County State's Atty., William L. Browers, Deputy Director, State's Attys. Appellate Prosecutor, Eleesha Pastor O'Neill, Chicago, Mary Beth Burns, State's Attys. Appellate Service Com'n, Elgin, for people.
*880 Justice McLAREN delivered the opinion of the court:
Respondents, Clarence H.B. (Clarence) and Jennie B., appeal from the orders of the circuit court which found them unfit and terminated their parental rights. On June 28, 1990, the trial court appointed the Department of Children and Family Services (DCFS) guardian with the power to consent to the adoption of 14-year-old Clarence T.B. (Tommy), 10-year-old Barbara B. (Barbie), 8-year-old Catherine B. (Cathy), and 5-year-old Christine B. (Crissy). These appeals have been consolidated and raise the issue whether the order finding respondents unfit and terminating their parental rights must be reversed because the evidence of unfitness was not clear and convincing. We affirm.
On May 18, 1988, a four-count petition was filed which alleged that Tommy was a delinquent minor based on several acts of violent behavior. On June 3, 1988, the petition was amended to add one count of criminal sexual abuse (Ill.Rev.Stat.1989, ch. 38, par. 12-15(a)(2)) and one count of aggravated criminal sexual abuse (Ill.Rev. Stat. 1989, ch. 38, par. 12-16(c)(2)(i)). The criminal sexual abuse count alleged that Tommy committed an act of sexual conduct on Cathy. The aggravated criminal sexual abuse count alleged that Tommy committed an act of sexual conduct on Barbie. On the same date, Tommy was adjudicated delinquent in that he committed the offense of battery and the offense of aggravated criminal sexual abuse.
On June 28, 1988, a supplemental petition was filed which alleged that Tommy was an abused minor in that Jennie sexually abused him by performing fellatio on him. Petitions were also filed alleging that the girls were abused minors. The petitions were amended on August 15, 1988, to include the allegation that Barbie had been abused by Clarence.
On September 15, 1988, the minors were adjudicated neglected and abused minors by respondents, their parents. The girls were made wards of the court on September 22, 1988. An amended order of adjudication was entered regarding Tommy which found that he was delinquent in addition to being an abused minor.
On October 18, 1989, DCFS filed petitions for termination of parental rights and power to consent to adoption of the minors. The petitions alleged that respondents were unfit because they: (1) had failed to maintain a reasonable degree of responsibility for the minors' welfare; (2) substantially neglected the minors in a continuous or repeated manner; (3) had "been extremely or repeatedly cruel to the" minors; (4) failed to protect the minors from conditions within their environment which were injurious to their welfare; (5) were depraved; and (6) failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minors, or to make reasonable progress towards the return of the minors within 12 months following the adjudication of neglected minors.
The trial court held the hearing on the petitions on several dates between January 30, 1990, and March 13, 1990, due to the extensive testimony offered by the State. The first witness to testify was Lou Gadow, the director of Family Advocate. Gadow first became involved with the family on June 14, 1988, when Tommy was referred to Family Advocate by the juvenile probation office for an adolescent offender assessment. On June 24, 1988, Tommy reported to Gadow that he had been sexually abused by his mother in that she performed oral sex on him and fondled him. Gadow then initiated a protective service assessment, which resulted in the girls being taken from the home and placed in foster care.
After Clarence visited Tommy at the detention center, Tommy retracted the allegation that he had been abused. In mid-July, Tommy was placed for evaluation in the adolescent psychiatric unit at Swedish American Hospital. Gadow recommended the evaluation because Tommy was "such an extremely disturbed child." Gadow described Tommy's affect in his meetings with her as either "very flat with * * * no facial expression" and with monotone speech or as "one of a great deal of vulgar language, threats, swearing[,] * * * hand *881 gestures, [and] fist gestures." When he first related the sexual abuse to Gadow, Tommy expressed concern that his revelation would cause his mother to harm herself or that his parents would go to prison and, if his parents were raped or killed in prison, it would be Tommy's fault. According to Gadow, Tommy would then state that he should kill himself.
Gadow described Tommy as "an extremely disturbed child; that he was probably one of the two most disturbed children of his age that [she] had ever encountered. He was very antisocial." Gadow related how Tommy "talked at length" about his past physical assaults on other children and on teachers at his school. In addition, Tommy was sexually preoccupied, and Gadow "was concerned about the level of sexual preoccupation that he evidenced in those early months." Tommy "talked extensively about sexual conquests, * * * [a]nd he would spontaneously deny his homosexuality." Gadow further stated that Tommy had exhibited inappropriate sexual behavior while at Swedish American. Tommy also described to Gadow his impression that one who has been victimized is weak and disgusting "and that the only way to not be a victim, in Tom's statement, was to be the aggressor." Gadow believed that Tommy's behavior was consistent with both a victim of sexual abuse and with a sexual abuse perpetrator. Gadow concluded that Tommy "had been sexually victimized and that the sexual victimization had been long-term and had been committed by both an adult male and an adult female, and that, in [her] opinion, that was his parents."
Gadow recommended that Tommy receive specialized offender treatment, but she encountered difficulty in placing him because few programs were able to respond to Tommy's needs, and they "generally have a much older population." Gadow explained:
"Normally when an adolescent offender is exhibiting this level of aggression the children are more likely to be older adolescents, like 15 as a mean age. And Tom at this time was 12 years old. So the facilities that were willing to consider him with the level of aggression that he had exhibited also had a minimal [sic] age requirement of 13. And so * * * I couldn't get the referral actualized to those places because of his age. And the places that normally took children Tom's age and did have openings * * * were not prepared to deal with the level of either general physical aggression or more specifically were absolutely refusing to deal with * * * a child who exhibited this sexual aggression."
Tommy eventually was placed at an out-of-State facility in March 1989.
By November 1988, Tommy had retracted his retraction and again alleged sexual abuse by both respondents. From that point forward, Tommy had been consistent in his allegations of abuse. Tommy told Gadow that the abuse started when he was about six years old, and he estimated that it occurred weekly. Tommy described to Gadow incidents in which the sexual contact was a group activity with the parents directing the children's activities. Tommy also described oral and anal sex with his father, and Tommy expressed concern about his physiological response to some of the sexual contacts. Tommy had been directed to engage in intercourse with Barbie, but then Tommy had done it on his own.
Gadow further discussed how Tommy was "hostile toward the court system" because respondents had been found not guilty of criminal charges. Gadow stated that Tommy related to her that on June 24, 1988, when Tommy was in detention, Clarence had threatened to kill Tommy for talking about the sexual abuse.
Gadow explained that her assessment that respondents had made no progress toward the return of the children was based primarily on respondents' continued denial that they sexually abused their children. Gadow also identified other problems respondents needed to work on, such as "[i]ndividual functioning, marital problems, family problems, [and] parent/child problems."
*882 Gadow explained the apparent inconsistency of the finding of abuse with Jennie's act of reporting Tommy to DCFS for abusing his sisters. According to Gadow, the reason Jennie reported Tommy was that she was angry at Tommy for independently engaging in sexual acts. A parent such as Jennie may be so angry that she will risk being investigated for sexual abuse to punish the abusive child. Gadow further explained:
"[B]ased upon the controlled dynamics that go on within intra-familial sexual abuse families, there is some logic to the level of anger that would occur when the person who is supposed to be in control sees their control being usurped by a * * * person who is in a middle level [of] control like the adolescent. In additional [sic], I have had other families that I have worked with who have come to the attention of the system because of a parent making a report about the child being sexually abused by someone else * * * as a way of covering up for a problem that the parent feels is likely to be identified anyway."
Gadow believed that because Tommy's behavior had been deteriorating at an accelerating rate, there would be increased scrutiny from the school system in the immediate future.
Gadow also testified that of all the cases involving a child who is a sexual aggressor, 100% of the female adolescents and 70% to 75% of the male adolescents had been victims of sexual abuse. Gadow specifically noted that she had never worked with a child offender under the age of 12 who had not been victimized. According to Gadow, 86% of the parents accused of sexual abuse by their children eventually admit to the sexual abuse. Gadow noted that respondents "exhibited a much more rigid level of denial than most of the people that [she] worked with and did not move beyond their denial to any level of discussion or willingness to look at the possibilities around their abuse behavior." Gadow distinguished the type of denial exhibited by respondents from that exhibited by people who had not committed any abuse.
Pat Graham-Toohey testified that on June 27, 1988, the girls were at the Family Advocate offices. Gadow asked Graham-Toohey to take care of Barbie while she was at the office. Barbie had been taken to the doctor earlier because she was not feeling well. Barbie was still not feeling well when she went to Graham-Toohey's office, and she said she wanted to sleep. Graham-Toohey offered to make up a bed for Barbie on the floor, but Barbie wanted to be held instead. Graham-Toohey held Barbie in her arms for about an hour while Barbie slept. When Barbie woke up, she started crying. Barbie told Graham-Toohey that she was afraid that she was going to get killed. When Graham-Toohey asked what she meant, Barbie said, "`My mother will kill me.'" Graham-Toohey reassured Barbie that mothers often jokingly say they are going to "kill" their children if they do not do their chores. Barbie continued crying and said that her mother meant it and that her mother would kill her if she told anyone what her mother made her do.
Barbie would not look at Graham-Toohey when she told her, "`My mom makes me get naked and touches my private parts and makes me touch my sisters' private parts.'" Barbie continued crying, pulled her knees up to her chest, and buried her head in the crook of Graham-Toohey's arm. Barbie's whole body was trembling while she was talking. At that time, all Graham-Toohey knew was that Tommy had been referred to Family Advocate for adolescent sex offender assessment. Graham-Toohey did not know any details, and she had not heard any allegations regarding respondents.
Graham-Toohey asked to be the girls' caseworker. Graham-Toohey observed that "Barbie was by far the most fearful child [she] had ever seen * * * at Family Advocate." Following a visit with respondents on July 6, 1988, Barbie was very upset and complained that she had a headache, a stomachache, and that she felt nauseous. Graham-Toohey asked if Barbie often felt that way, and Barbie told her that she "`always [had] headaches and stomaches [sic] when the abuse is happening.'"
*883 In addition to the touching, Barbie described for Graham-Toohey how Jennie performed oral sex on Barbie and that Barbie was made to perform oral sex on Jennie. Barbie described the odor of her mother's genital area and what she felt when she performed oral sex on her father. Barbie was not able to place these events in time, but she told Graham-Toohey that it happened "a lot." According to Graham-Toohey, "[e]ight year olds that have not been sexually abused would not be able to describe graphically the odor of their mother's genitals or what semen tasted, felt like in a mouth." Graham-Toohey believed Barbie's allegations after Graham-Toohey questioned Barbie about whether the things she described had happened with Tommy and not her parents. Not only did Barbie's allegations remain consistent, but "when she described what her parents had did [sic] to her, she resumed this fearful behavior where she was crying. She curled up in the fetal position. She would tremble, wrap her arms around herself." At times she would cling to Graham-Toohey and not look her in the face when talking about the things that happened. In addition, Barbie started biting her nails. According to Graham-Toohey, such behavior is consistent with children who had been sexually abused often.
Barbie revealed the incidents of sexual abuse "incrementally," that is, she would disclose more information the more protected she felt. In Graham-Toohey's experience, those children who tend to disclose information incrementally are those who have been victims of intrafamilial victimization, which is accompanied by coercion and secrecy.
When respondents were found not guilty of the criminal charges, Barbie was upset. When Graham-Toohey informed her that visitation with her parents would resume, Barbie cried and told Graham-Toohey:
"`I hate my parents. They should go to jail for 100 years. I don't want to see my parents.'"
Graham-Toohey further testified that the results of a physical examination of Barbie supported her allegations of penetration. Graham-Toohey also stated that although Barbie's statements to her had remained consistent, Barbie would not have testified consistently with those statements if the parents were in the courtroom while Barbie was testifying. Although Barbie was given the option of testifying in chambers, she agreed to testify in the courtroom because she "was an overly compliant child" who tried to say what she thought people wanted to hear. According to Graham-Toohey, Barbie "was scared to death to come to court." Graham-Toohey believed that Barbie's testimony in the prior hearing was unreliable because her parents were present and, therefore, Barbie was probably reluctant to tell everything.
Mark Morrison, the clinical services supervisor for Family Advocate, testified he conducted an assessment of Cathy and Crissy in June 1988. Initially, Cathy was "very anxious, very frightened and reluctant to discuss family issues." Cathy openly discussed school and extracurricular activities, but when questioned about her family, Cathy became "withdrawn, sullen, quiet, [with her] head down." Cathy eventually admitted that she did not want to talk about her family because of her fears about how others would respond to what she had to say, about getting others "in trouble," and of being harmed herself.
During the interview session on June 27, Cathy told Morrison that "her mother had touched her in the same place that her brother, Tommy, had," and she pointed to her vaginal area. In subsequent sessions from June through August 1988, Cathy related incidents of sexual contact with her father and two other family members residing outside the home. Cathy discussed in detail the sexual contact, which included oral sex. While discussing these things, Cathy spoke with halted speech and was visibly anxious. Frequently, Cathy would stop talking and need to be supported and comforted. Based on Cathy's demeanor, Morrison believed that she was very frightened, and he "concluded that Cathy had been repeatedly sexually molested over a fairly extensive period of time."
*884 In addition to Cathy's demeanor during the interviews, her sexual acting out with another foster child while she was in foster care indicated to Morrison that Cathy had been sexually abused. Cathy also exhibited a factual knowledge of sexual activity beyond that of a normal six-year-old, including descriptions of both vaginal and anal intercourse.
Morrison evaluated Crissy during June and July 1988, when she was three years old. Crissy frequently exhibited regressed behavior. Crissy "talked about the bad touches that her sisters received from Tommy." Crissy initially denied that anything bad happened to her, but later she acknowledged sexual contact with her parents and with her brother. Morrison determined that Crissy's statements regarding sexual contact with her parents were valid, based on Crissy's descriptions, including how her "mother made her put her hand and wiggle on her private part." Crissy described oral sex with her mother as "`icky,'" and when asked how she felt during sexual contact with her father, "she simply said, `Ow.'" While she was describing these things, Crissy appeared anxious and afraid. In Morrison's opinion, neither Cathy nor Crissy had been "programmed" to relate sexual experiences.
Morrison discussed the possible sources of a child's knowledge of sexual activities. Morrison explained:
"[T]he kid who has seen a pornographic film depicting, say, oral sex will describe it and talk about it. A child who has had that done to them [sic] will not only be able to describe and talk about it but provide other specific kinds of details and information about that than the child simply having seen it, say, in video."
According to Morrison, the sexually abused child will display an "emotional congruence with things" the child was describing. Morrison stated that Cathy continued to have ambivalent feelings towards her parents, and she told Morrison that she wished her parents would admit their problems so Cathy could go home.
Lou Gadow was recalled to testify about her work with respondents beginning in March 1989. Respondents told Gadow that they wanted to reunite with their children. Gadow informed them of what was required of them for the return of the children. According to Gadow, respondents showed some anger with Family Advocate, so Gadow indicated that they could work with their own professional. Respondents told Gadow that they had never done any of the abuse and, therefore, there was no need for them to resolve their problems.
Respondents did, however, attend sessions at Family Advocate throughout 1989. Gadow began to take social history information from respondents individually. Both respondents continued to deny the occurrence of any sexual abuse and to deny the existence of any individual problems. Respondents indicated that there were no marital problems, family problems or parenting problems and that they did not need any services for sexual abuse behavior. Clarence's "response to [Gadow's] approach was primarily to question [her] relationship with God and to make accusatory statements about [her] alliance with satan." Clarence also accused Gadow of having "programmed the children." On some occasions, Clarence calmly explained to Gadow how "satan [was] working through this system and * * * [Gadow] was doing this [programming] to the children * * * because of satan." On other occasions, Clarence appeared very angry and "talked very loudly in a very accusatory tone." In May 1989, Gadow informed Clarence that there would be no further discussion of her religious affiliations. Clarence indicated that he did not think Gadow was doing it deliberately, "but that satan worked through people without them knowing it." After that, Clarence was never antagonistic towards Gadow, although he still complained about "the system."
Gadow further testified that the social history of Jennie revealed that she "had an extensive history of sexual victimization of herself by her father and two of her brothers." Clarence repeatedly referred to his being mistreated or persecuted during his social history. Gadow indicated to Jennie that her own victimization could contribute *885 to her problems as an adult, including marital and parental problems. Jennie responded that she had already dealt with her own victimization in previous counseling.
Respondents refused to participate in psychological testing through Family Advocate. Respondents were allowed to select a psychologist, and they indicated they would participate in testing with that person. Respondents were tested on several different occasions. Before the results were in, Clarence told Gadow that he doubted the ability of his psychologist and the validity of the test results. Gadow discussed the test results with respondents, and she encouraged them to discuss the evaluation with the psychologist. The evaluations showed that respondents are very similar to each other, in part because "they are antisocial." Gadow explained antisocial behavior as not abiding by the primary social mores and laws of a community and believing in things opposite of what was commonly believed. Clarence responded "that if they were antisocial, it was because they followed God's laws, as opposed to social laws."
The type of personality respondents showed tends to be a type which refuses to take responsibility for their own behavior. According to Gadow, that was the exact problem respondents had in resolving their problems. They responded by saying that they did not have these problems.
Gadow tried to have the girls visit with respondents, but Cathy and Barbie refused. Instead, Gadow made videotapes of the girls expressing their concerns to respondents. After viewing Cathy's videotape, respondents denied that they had abused her and stated that Cathy had been programmed to say those things. Gadow also tried to discuss the children's problems with respondents, including Tommy's extreme psychopathology and Barbie's post-traumatic stress disorder. Respondents would only talk about the system violating their parental rights.
Gadow set up meetings with Barbie and respondents and Cathy and respondents. Barbie did not want to see respondents, and, after five minutes, she left the room crying because respondents said they would not lie and say they abused Barbie. Cathy was angry with respondents because the parents of several girls in her therapy group had taken responsibility for the abuse and the girls were making progress. Cathy wanted respondents to admit to the abuse. In the meeting, Clarence denied that they ever abused Cathy, and respondents said that they were not going to admit to something that they did not do. Cathy started to cry and asked to leave.
The result of the meetings was that "instead of becoming less entrenched in denial, [respondents] were becoming more entrenched in denial." They became more insistent that the children were "programmed by the corrupt system." Tommy, who was in a county home in Minnesota, sent a videotape for respondents. In it, Tommy stated he was upset with respondents because they had not "`admitted up to the abuse.'" Tommy explained that he had taken responsibility for his sexual assaults, and he knew that was difficult, but if he could do it, he did not understand why respondents could not do likewise. Tommy also accused Clarence of being a "`wimp'" because, during the sexual abuse, Clarence did what Jennie directed him to do. At the end of the tape, Tommy expressed the hope that if respondents could admit that they sexually abused their children, the family could be together again.
In a meeting between Tommy and respondents on December 1, 1989, Tommy reiterated what he said on the tape. Based on his parents' responses, Tommy became angry and told respondents that he did not want to see them because they still lied. The meeting ended when Tommy told them, "`I don't want to see you until you are ready to go straight about what happened.'"
On cross-examination, Gadow explained that most of the families served by Family Advocate exhibit "a tremendous amount of hostility about intervention and about placement of their children in the initial stages." Gadow admitted that respondents attended every scheduled meeting. In addition, Gadow admitted that occasionally *886 respondents acknowledged that there were problems other than sexual abuse in the family, in particular, financial problems as a result of litigation. Gadow explained what she had expected of respondents:
"[I]n terms of the relationship between the parents and the children, because of the children's adamance in terms of wanting the parents to admit the behavior in order to resolve the problems * * * there would be no potential for healing the relationship, the estrangement between the parents and the children, without their admission."
According to Gadow, in a situation where the child wants the parent to admit to abuse which did not occur, Gadow would attempt to rid the child of that distortion of reality so that the child would come to see that the abuse did not happen. Gadow had seen that situation arise in the context of custody disputes. Gadow believed "the distortion is with [respondents] and that the children's perception is accurate." Gadow stated that respondents' denial is the reason they had not resolved their problems, which led to the termination hearing.
Jennie testified that she was 36 years old and had been married to Clarence for 16 years. Respondents sought professional help for Tommy when he was 2½ to 3 years old because he was a very destructive child. Tommy was diagnosed as being hyperactive and was placed in a special program for preschoolers. Tommy's behavior in elementary school was "not too bad." Around the time Tommy was in third and fourth grades, he became more aggressive by fighting with other children and disobeying teachers.
When Tommy was 11 years old, he attacked two teachers. Respondents took him to a social worker, Penny Shaw, for counseling. Tommy saw Shaw for about six months. About a month after Tommy stopped counseling with Shaw, respondents contacted Paul White, a social worker who had worked within the juvenile system. The first meeting with White was in May 1988. White agreed to counsel Tommy. At the second meeting, White outlined what he expected to achieve with Tommy.
The third session was around the end of May or beginning of June 1988. The night before that session, Cathy and Barbie had come to Jennie and told her that Tommy touched them improperly. This was the second time Cathy and Barbie had complained to Jennie about it. Jennie discounted the first complaint as normal curiosity between "boy and girl." Clarence had talked to Tommy about the complaint the night before the session. At the third session, Jennie told White that she was concerned that Tommy might be sexually abusing the girls. Tommy admitted that he touched the girls, and White told Jennie that she would have to call DCFS or the child abuse hot line. White dialed the number, and Jennie explained to the person what Tommy told her. Jennie was aware of the ramifications of notifying the authorities because her oldest brother "spent six months in jail" for sexually abusing her. Tommy was very upset with Jennie when they left the session.
Because of Jennie's report, DCFS set up a family meeting on June 3, 1988, at Family Advocate. At the meeting, Ruth Nolan questioned respondents for more details regarding what was going on between Tommy and the girls. Nolan then interviewed the girls out of respondents' presence, and she interviewed Tommy separately. Nolan then informed respondents that Tommy admitted to abusing the girls and that he had to be placed in juvenile detention. Tommy was taken into custody at that time.
On June 20, Jennie returned to Family Advocate to set up a social history because Tommy had been ordered to undergo testing as a sex offender. Jennie cooperated with Family Advocate and answered their questions. On June 24, Rockford police officers came to Jennie's house to discuss Tommy's allegations of sexual abuse by Jennie. Jennie accompanied the officers to the police station, and the girls were taken into protective custody.
Jennie denied sexually abusing the children and related that the children had two separate cases of pinworms, which required respondents to check the children's buttocks at night, while they were asleep.
*887 Jennie testified that she and Clarence had been charged with criminal offenses in regard to the sexual abuse. Both respondents were found not guilty of the charges. Respondents then went to counseling at Family Advocate. Respondents had weekly visits and counseling with Gadow from March through November 1989. According to Jennie they did not pursue counseling with the psychologist who tested respondents because he told them "it was not necessary; that it was a waste of his time and [respondents'] money to continue to see him." The psychologist told respondents to continue with Family Advocate.
Jennie denied that there was ever any pornographic material in her home, and she indicated that the children would not have had access to any pornographic materials. Jennie believed that Barbie said she never wanted to see her parents again because Barbie had been taught that she would be punished if she lied. Jennie had no idea why her children would lie about sexual abuse.
Clarence, who was 40 years old, denied sexually abusing any of his children. Clarence testified that several times he had discussed with Tommy the girls' accusation of sexual abuse by Tommy. Tommy denied that he had touched his sisters and accused them of "trying to get him in trouble." Clarence forbade Tommy to go in his sisters' bedrooms. After the first time the girls complained about Tommy, Clarence moved Tommy to a bedroom downstairs. According to Clarence, he did everything Family Advocate requested of him except for admitting that he abused the children.
On cross-examination, the attorney for the guardian ad litem asked Clarence to describe his relationship with Tommy when Tommy was 3 to 2½ years old. Clarence responded, "He was my whole life." Clarence related that Shaw had informed Clarence that Tommy was angry and despised authority figures. Shaw also thought Tommy might have been the victim of sexual abuse. Clarence stated that he talked with Tommy about that, but that Tommy denied that anything ever happened to him. Clarence admitted that his relationship with Tommy had been strained since Tommy started having trouble at school, in 1982 or 1983.
Clarence indicated that the children were lying about any sexual abuse. Clarence believed that their statements were suggested to them by "the D.C.F.S. caseworkers and workers at Family Advocate." Clarence further expressed the belief that DCFS forced the children to testify about sexual things "[b]y continued suggesting that the children are denying the fact that this happened and are afraid that it would get us in trouble if they admitted to the truth." Clarence agreed that people who had been victimized as children would be more inclined than other people to abuse their children.
Clarence explained the source of Tommy's pathology was derived from trouble Tommy had with children in the neighborhood, i.e., the other children teased and harassed Tommy. When Clarence complained about the children harassing Tommy on the bus, the authorities put the blame on Tommy because he was disruptive. Although the psychiatric reports indicated that both Tommy and Clarence are antisocial and have difficulty with authority figures, Clarence did not make any connection between himself and Tommy's problems.
In rendering its decision, the court explained that it had "given a great deal of attention to this case," reviewed the evidence, the exhibits and the law. The court recognized that termination cases "carry the gravest of consequences for all the parties concerned." The court noted that it observed the demeanor of the witnesses testifying in this proceeding and considered the question before the court as one of their credibility. The court explained:
"The parents have advanced two reasons why the children said what they said. One is in regard to Tommy. There has been a suggestion by the parents that Tommy has said the things he said in order to relieve himself of the responsibility of his own acts of sexual misconduct against the girls. That reasoning, however, does not address why the girls *888 have said what they have said about the parents' conduct.
The other reason that the parents advance for explaining or justifying why the children have said what they have said is that the children have been programmed or indoctrinated by the Department of Children and Family Services and Family Advocate to say the things they said. I find it hard to believe that Family Advocate or the Department of Children and Family Services could indoctrinate these children in this way to say the things that they said.
Also, I have these statements of how much fear the children were in. I have testimony regarding how they trembled, how they demonstrated other obvious symptoms of fear; and I don't know how the department or Family Advocate could tell or make the children do that.
I suppose it's possible that the children didn't do it and that the witnesses on behalf of the State are just lying about what they observed, but I find it hard to believe that.
There is also the consideration in my mind as to how the children would know about the things that they knew. * * * We know during the testimony that the children weren't exposed to any * * * pornographic materials, any magazines. I don't know how the children could have got that information other than from having experienced it themselves unless, of course, I adopt the theory that Family Advocate has taken these children and told them about these things, made them lie about it, and then made up stories about them trembling and exhibiting the symptoms of fear; and I am unwilling to adopt that theory.
Regarding the efforts and the progress of the parents * * * towards the return of the children, the simple question is whether the parents' failure to admit what's happened can form a basis for the State to show and prove that they failed to make reasonable efforts and they failed to make reasonable progress. After reflection on that point, it occurs to me that it would be impossible for any agency to treat parents for something that they do not acknowledge has existed. And to that extent I believe that the State has shown and proved by clear and convincing evidence that the parents have failed to make reasonable efforts and failed to correct the conditions which were the basis for the removal of the children."
The court found that the State proved by clear and convincing evidence all of the allegations in each count of the petitions against both respondents and, therefore, found respondents to be unfit parents.
On June 28, 1990, the court held a hearing to determine the best interests of the children. Pat Graham-Toohey testified that both Tommy and Barbie did not want to live with respondents. Mark Morrison testified that Cathy and Crissy wanted to return home, but they were still angry with respondents for abusing them. Respondents testified that they did not abuse the children, and they took a lie detector test which they passed. After hearing the arguments of counsel for all the parties, the court decided that it would be in the children's best interests that the parental rights of respondents be terminated. Respondents timely filed a notice of appeal in each cause. The appeals were consolidated on respondents' motion.
Respondents contend that the orders finding them unfit and terminating their parental rights must be reversed because the State failed to sustain those charges by clear and convincing evidence.
A trial court's finding of parental unfitness must be given great deference because it had the opportunity to view the witnesses and evaluate their credibility. (In re Henry (1988), 175 Ill.App.3d 778, 790, 125 Ill.Dec. 413, 530 N.E.2d 571.) Consequently, a reviewing court will not reverse that decision unless it is against the manifest weight of the evidence. (Henry, 175 Ill.App.3d at 790, 125 Ill.Dec. 413, 530 N.E.2d 571.) Parental rights are of the gravest importance and should be terminated only when clear, convincing evidence establishes that the parent is unfit. In re *889 Paul (1984), 101 Ill.2d 345, 352, 78 Ill.Dec. 149, 461 N.E.2d 983.
The trial court should not consider the child's best interests when determining whether the parent is unfit. (In re Adoption of Syck (1990), 138 Ill.2d 255, 276, 149 Ill.Dec. 710, 562 N.E.2d 174.) A parent may be found unfit if he or she fails to make reasonable efforts to correct the conditions which were the basis for the removal of the child or fails to make reasonable progress toward the return of the child within 12 months after an adjudication of abused minor. (Ill.Rev.Stat.1989, ch. 40, par. 1501(D)(m).) Each case of an adjudication of parental unfitness is unique, and comparisons with other causes are not appropriate. Syck, 138 Ill.2d at 279, 149 Ill.Dec. 710, 562 N.E.2d 174.
Respondents argue that because the trial court based its finding of unfitness solely on respondents' refusal to admit the allegations of sexual abuse, respondents are forced into an untenable position wherein they must admit to conduct they have consistently denied or lose all parental rights. Respondents emphasize that the allegations were found "not proven" in a criminal proceeding. According to respondents, their refusal to admit to such conduct is insufficient to support a finding that they did not make reasonable efforts or reasonable progress.
Contrary to respondents' argument, the appellate court has held that a parent's failure to acknowledge that sexual abuse has occurred and, therefore, failed to take steps to prevent the children's exposure to that abuse, is sufficient to support a finding of unfitness by clear and convincing evidence. (In re A.C.B. (1987), 153 Ill. App.3d 704, 708-09, 106 Ill.Dec. 653, 506 N.E.2d 360.) We agree with the trial court's assessment that respondents can make no progress in resolving their sexual abuse problems until they admit that they have such problems.
Respondents, however, challenge the existence of abuse, arguing that the allegations were not supported by clear and convincing evidence. The State counters that respondents are estopped from denying the fact of sexual abuse because they did not appeal the finding that the children were abused minors. The State relies on In re Boolman (1986), 141 Ill.App.3d 508, 512, 96 Ill.Dec. 187, 491 N.E.2d 1, in support of its estoppel argument.
We agree with respondents that estoppel principles do not apply in this situation. Boolman cited no authority for that proposition of law and did not consider the difference in the burdens of proof between the proceedings. The burden of proof in a proceeding to determine whether a minor is abused is the preponderance of the evidence standard (see Ill.Rev.Stat.1989, ch. 37, par. 802-18(1)), whereas in a proceeding seeking to declare parents unfit, the State must prove the allegations by clear and convincing evidence (see Ill.Rev.Stat.1989, ch. 37, par. 802-29(3)). It is axiomatic that, because the burden of proof in the former proceeding is lower than in the latter proceeding, a court's ruling on a factual issue when determining whether a child is an abused or neglected minor is not binding in the proceeding to determine the fitness of the parents. (See People v. Golden (1983), 117 Ill.App.3d 150, 155, 72 Ill.Dec. 710, 453 N.E.2d 15; see also People v. Zeravich (1965), 64 Ill.App.2d 150, 157, 212 N.E.2d 282.) Similarly, we reject respondents' assertion that the acquittal necessarily means that the charges are unfounded. In the criminal prosecution, the trier of fact determined that the State failed to prove beyond a reasonable doubt that respondents committed the charged offenses, whereas in the present proceeding, the State only needed to prove that respondents committed these offenses by the lesser standard of clear and convincing evidence. See In re T.D. (1989), 180 Ill.App.3d 608, 612, 129 Ill.Dec. 527, 536 N.E.2d 211.
Respondents complain that the only evidence supporting a finding of abuse was hearsay and that the trial court never heard the children's testimony. While respondents admit that hearsay is permitted by the Juvenile Court Act (Act), they argue that hearsay testimony alone is insufficient to meet the clear and convincing standard. *890 Citing In re Brunken (1985), 139 Ill.App.3d 232, 93 Ill.Dec. 730, 487 N.E.2d 397, respondents maintain that the Act requires corroboration of such hearsay statements and the fact that the children related similar things to different people and that employees of Family Advocate opined that the children exhibited signs of abuse are insufficient corroboration.
Section 2-18 of the Act provides that prior statements of the child relating allegations of abuse or neglect are admissible; "[h]owever, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." (Ill.Rev. Stat. 1989, ch. 37, par. 802-18(4)(c).) Although the children did not testify in the hearing to determine respondents' fitness, the trial court had the transcript of Barbie's and Cathy's testimony from the hearing in which they were adjudicated abused minors. Brunken is inapposite because there the child had never testified and, because the allegation arose from a visitation dispute between the parents, the mother had a motive to fabricate allegations of sexual abuse by the father. (See Brunken, 139 Ill.App.3d 232, 93 Ill.Dec. 730, 487 N.E.2d 397.) By contrast, in the present case there is no motive for the children to fabricate the allegations of abuse. Furthermore, the statements of Barbie and Cathy were subject to cross-examination and, therefore, did not need to be corroborated. The hearsay statements related by the employees of Family Advocate were corroborated by the girls' testimony in the prior hearing.
Respondents' attacks on Barbie's credibility are insufficient to require reversal. As Pat Graham-Toohey testified, Barbie would have been reluctant to reveal the extent of the abuse while testifying in the prior hearing because respondents were present in the courtroom. In addition, for testimony to be clear and convincing, it need not be entirely void of discrepancies and unimpeached, so long as the testimony is consistent and the discrepancies do not detract from its reasonableness. (People v. Hickox (1990), 197 Ill.App.3d 205, 213, 143 Ill.Dec. 180, 553 N.E.2d 1166.) Barbie remained consistent in her allegations that she had been sexually abused by respondents and Tommy. We emphasize that Barbie was eight years old at the time she testified.
Even if Barbie's testimony is discounted, Cathy's testimony was clear and convincing. Cathy, who was six years old at the time she testified, had difficulty with dates and times; however, she indicated that if she could not remember something, she would not adopt the answer that someone suggested to her. In addition, any discrepancies regarding specific details in the girls' testimony actually lends credibility to the allegations. The girls testified that they could not remember how old they were when the abuse began, but it was before they were in school, and this activity occurred frequently. At a minimum, then, we may assume the abuse had to have been going on for at least four years. It is not unreasonable to conclude that the girls did not relate the details of every incident which occurred over a four-year period. Moreover, both Barbie and Cathy were asked "ever" questions, and it is not unlikely that they did not understand that they should answer in generalities and instead related details of a specific incident.
The trial court found that the evidence of abuse was clear and convincing, and the only way the trial court could find otherwise was to believe respondents' "conspiracy theory." Respondents presented no evidence to establish any motive for Family Advocate or DCFS to indoctrinate the children or make them testify to acts of sexual abuse. The evidence showed that the girls were very afraid and reluctant to divulge information about the abuse and that Tommy was severely disturbed as a result of being sexually abused by his parents. In addition, the trial court was impressed by the children's knowledge of sexual activity in the absence of any exposure to pornographic materials. Respondents' ability to pass a lie detector test is not inconsistent with these findings, since it may demonstrate respondents' deep level of denial. Based on these facts, the finding that the *891 children were sexually abused was not against the manifest weight of the evidence.
Respondents did not dispute that they refused to admit that they abused their children. The trial court, which assessed the credibility of the witnesses, believed the testimony that the children were angry at respondents for refusing to admit to what happened. The trial court found that respondents' refusal to acknowledge and take responsibility for the sexual abuse precluded any progress towards resolving the family's problems. We conclude that this clearly and convincingly establishes that respondents have failed to make reasonable efforts to correct the conditions which led to the children's removal and failed to make reasonable progress towards their return.
The judgment of the circuit court of Winnebago County is affirmed.
Affirmed.
DUNN and NICKELS, JJ., concur.