THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BARBARA SUE NYBERG, Defendant-Appellant.

(No. 58107; ▮▮▮▮▮▮▮▮▮▮

First District (3rd Division)—November 21, 1974.

McNAMARA, P. J., dissenting.

James J. Doherty, Public Defender, of Chicago (Bernard L. Schwartz, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Dennis J. O'Hara, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Defendant, Barbara Sue Nyberg, was indicted for two counts of murder in connection with the death of her 4½-month-old son, Ronald Nyberg. (Ill. Rev. Stat. 1971, ch. 38, par. 9—1(a).) She waived her right to a jury trial, and received a bench trial in the circuit court of Cook County. After approximately 2 days of trial during which time the prosecution presented a major portion of its case-in-chief, defendant entered a negotiated plea of guilty to voluntary manslaughter and was sentenced, according to the plea agreement, to a term of 5 to 20 years in the penitentiary. She appeals from the judgment which was entered on the plea.

On appeal, defendant contends that (1) the trial court erred in accepting a plea of guilty when defendant did not make an unequivocal statement of guilt, (2) there was no factual basis for the plea, and (3) the trial judge erred in that he did not personally inform the defendant of and did not determine that she understood the nature of the charge.

We reverse and remand with directions.

Defendant's contentions must be evaluated in the context of the relatively extensive proceedings conducted before she entered her plea of guilty. In addition to the trial testimony, the court heard testimony during two hearings on defendant's pretrial motions to suppress evidence. The trial court also included in the record three reports which related to defendant's psychological condition and medical history. We have scrutinized the record carefully in order to evaluate defendant's claim that there was no factual basis for the plea.

Defendant was a 22-year-old married woman who had a history of epilepsy. On June 3, 1971, at 7:30 A.M., Steve Tomaskovic, her 17-year-old boyfriend, telephoned the defendant, whom he had known for approximately one year. He finished drinking a bottle of wine, which had about "four fingers" left in it, and arrived at her home at about 8 A.M. Defendant, the deceased, her 4½-month-old son, and another child, aged 18 months, resided at the home of defendant's parents. After his arrival defendant had two drinks of an alcoholic beverage known as Brass Monkey.

Defendant prepared a bottle for the deceased, after which she and her boyfriend went into an upstairs bedroom where defendant put the

bottle next to the head of the infant in the crib. Tomaskovic testified at trial that at this time he did not see the baby move. On cross-examination it was brought out that on a previous occasion he may have said that he did see the baby move, although he denied making such a response.

Defendant and her boyfriend then went into a downstairs bedroom where they had sexual intercourse. After they had finished Tomaskovic went to the washroom for about 5 minutes. During a second act of intercourse, the 18-month-old child broke a flower pot, glasses, and some dishes. They got up, got dressed, and Tomaskovic went to the bathroom again. Defendant went upstairs to the infant's bedroom and, according to her testimony, found that the infant was not breathing and in her opinion was unconscious.

When Tomaskovic came out of the bathroom he saw defendant coming down the stairs. According to his testimony, she leaned over, put her hands on her face, said she felt faint, and went outside. Tomaskovic cleaned up the mess that the older child had made in the kitchen. According to defendant's testimony she called Doris Stewart, who called the police. Also, at that time she saw a friend of her brother outside and called to him for help. They went upstairs and defendant tried to resuscitate the infant. Shortly thereafter, an ambulance and the police arrived.

Tomaskovic testified that at no time that morning did he see the defendant strike the infant or hear her say that she was going to strike him.

Two police officers investigated the infant's death. Officers Wagner and Kosinski arrived at defendant's residence at 1:18 P.M. They went upstairs, felt the baby's pulse, and noticed that his body was stiff and had a very pale color. Both observed two marks on the baby's head which Officer Wagner described as resembling scars, and Officer Kosinski described as lines, like a welt. One mark went from one ear to the other ear across the back of his head. The other mark was just above one of the ears. Officer Wagner noticed no blood or other marks on the baby's body.

At the hospital the baby was pronounced dead at 1:50 P.M. According to Officer Kosinski a doctor said the baby had been dead for approximately 5 to 11 hours. It was the stipulated testimony of defendant's father that the infant was alive at 5:30 A.M. or 6 A.M. that morning.

The police took defendant to the Tinley Park police station. During questioning she related the events of the morning of June 3, 1971. She was awakened at about 4 A.M. or 4:30 A.M. by the baby's crying. She fed the baby. She woke up again at 5:30 A.M. in order to wake up her father and sister. At 8 A.M. she got up again to feed the baby. At 9 A.M. her other son woke up. At 12 noon she gave the baby his medicine

and he appeared to be alright. At 12:30 P.M. she went to feed him, noticed that he was not breathing, and called a friend for assistance. During this narrative defendant did not mention Tomaskovic.

The police then transported defendant to the courthouse at Midlothian, Illinois. Her father was present at this time. According to defendant she was told at the Tinley Park police station that a lawyer would be appointed for her, but none was appointed. Instead, she met Assistant State's Attorney McNulty, whom she thought, according to her testimony, was her appointed counsel. She was again questioned and gave substantially the same account of the events of the morning of June 3, 1971. Still, she did not mention Tomaskovic.

At about 4 P.M. the police transported defendant back to the Tinley Park police station. At about this time, according to the testimony of Detective Deahl of the Tinley Park police, he was informed that the baby's death was "unnatural." Defendant's father gave him permission to search the house and he directed other police officers to remove the crib from the bedroom. The police recovered a crib which had a small rod attached to it.

At the Tinley Park police station defendant made a statement which indicated that she still believed her baby was alive. During a questioning session, for the first time she reluctantly mentioned her involvement with Steve Tomaskovic. According to Officer Kosinski, who was present, she said that Tomaskovic came over to the house at about 7:40 A.M. At about noon he asked her to go outside to see if a friend of his was there. After being outside for about 5 minutes, she returned and heard some noise coming from upstairs which sounded like the baby's crib moving. Ten minutes later Tomaskovic came downstairs and told her that the baby was asleep. Fifteen minutes later he left.

At this point in the questioning the assistant State's Attorney directed the police to pick up Tomaskovic as a suspect. At the police station defendant and Tomaskovic confronted each other but their stories were conflicting. After Tomaskovic left the room defendant said "I might as well get it over with now. I did it. I killed my baby." Soon thereafter, she retracted these remarks, stating that the only reason she said she killed her baby was to try to "get Steve off the hook." During defendant's second visit to the Tinley Park police station, the police took her statement in which she said that Tomaskovic was the father of her deceased child. Tomaskovic testified that while defendant was pregnant with the deceased she told him that he was the father, but he never believed her. He did testify that he had been having sexual intercourse with defendant for approximately 1 year preceding June 3, 1971.

On the following day, June 4, 1971, the police took defendant to the

Bedford Park police station to take a lie detector test. After the test was completed, defendant was handcuffed and placed in a squad car. Detective Deahl informed her that she was under arrest for murder. She responded "So what? I did it." According to the testimony of Matron O'Brien, who was also present, defendant became quiet and started crying after she made the statement.

During the change of plea hearing, the trial court made a number of psychological reports part of the record. In the words of one of the psychiatrists, "psychological testing shows her to be a rather passive person with a very low capacity for violence and certainly not of infanticidal potential." Her psychological report showed her to be in the dull normal range of intelligence with serious psychological problems. In the words of a clinical psychologist who examined and tested her, "she is essentially an intellectually and emotionally impoverished girl," but "there are no indications of homocidal [sic] tendencies in her test responses." Before trial the court ordered a psychiatric examination. Following an examination the doctor filed a report indicating that the defendant was competent to stand trial. The report stated that she understood the nature and purpose of the proceedings and was able to cooperate with her attorney.

The procedural framework leading up to the guilty plea follows. On March 1, 1972, the court held a hearing on defendant's pretrial motions to suppress evidence and denied the motions. Trial began on May 18, 1972. On May 19, 1972, the trial court interrupted the prosecution's case-in-chief and held a hearing on defendant's motion to suppress a statement that she allegedly made on June 4, 1971. The trial court denied the motion late in the afternoon of May 19, 1972, a Friday. The case was continued until Monday, May 22, 1972, at 11 A.M. The assistant State's Attorney indicated that the first witness he would call Monday would be Dr. Kearns.

However, the next proceeding shown in the report of proceedings was on June 29, 1972, over one month later, at which time a hearing was held on defendant's change of plea. The record shows no testimony of Dr. Kearns.

The following colloquy took place at the hearing on defendant's change of plea:

"THE COURT: I wish you to pay close attention to what I have to say to you here.

Now, this may be a little difficult, but I want you to use as much composure as you can to understand everything that I say to you. First of all, I would like to say to you the Supreme Court Rule 402 of the State of Illinois says that your attorneys, the State's

Attorney and myself can have a conversation outside of your presence in the nature of plea bargaining. Then it is my job to come out here and tell you what we talked about, what we more or less agreed to, and see if that is what your attorney told you, so you will know in open court the talks that have been going on in conference in my Chambers, and, generally, it is this.

You know what you are charged with. You are charged with murder which, in Illinois, demands a minimum fourteen year sentence, but that if you plead guilty to a lesser charge of voluntary manslaughter, that carries a sentence of one to twenty years. And then if you plead guilty knowing all this, this court would sentence you from five to twenty years.

Now, that's what went on outside of your presence these last few weeks in my chambers. Do you understand that?

MISS NYBERG: Yes.

THE COURT: And is that what your attorneys told you?

MISS NYBERG: Yes."

The trial judge then admonished her that by pleading guilty she waived her right to a jury trial, that the minimum and maximum sentence for voluntary manslaughter was 1 to 20 years, and that she had a right to appeal. The Court continued:

"All right. Now, Mr. Bloss, or whoever will do the stipulating, I think I have admonished her to all of her Constitutional Rights. I'm quite sure she understands everything.

MR. BLOSS: Your Honor, Mr. Tuney [sic] and I have discussed this case, and after trying it for two or three days, with the defendant, Barbara Nyberg, and with her mother and father and with her minister, all of whom are in court here today, and based upon everything that you have told her—I have told her the same things, and based upon the record and the evidence that we see, we recommend that she does accept the plea of guilty to voluntary manslaughter.

I have talked to Barbara about it. She says that she pleads guilty generally. She says she could not have murdered her child. She says the only way in which she could have possibly harmed her child would have been if her child had provoked her or did something to make her angry.

THE COURT: Based on that is why you are changing your plea; is that right?

MR. BLOSS: That's right. That is the stipulation.

MR. KLAPMAN: Does she so stipulate to that?

MR. BLOSS: Yes.

THE COURT: She will have to say yes to that, that that is the stipulation. This is all in open court. I want her to say yes, she stipulates.

MISS NYBERG: Yes."

The assistant State's Attorney then reviewed the evidence which had already been presented, and represented to the court that the prosecution would have called Detective Deahl, if the case had continued. He then stated:

"Based on that, the People of the State of Illinois would have then rested their case in chief, which I believe would have been enough evidence to accept the basis of this plea.

THE COURT: Yes. All right. Based on that—One thing I would like to add. I am going to make a part of this record the communication from the psychiatrist who has examined Miss Nyberg at great length in between. This has nothing to do with the change of plea, but I will have you file all those papers. Put it in this file, Mr. Clerk. They are on my desk. I'll bring them out. But based on that, and I think everybody knows everybody's rights, what has to be done. I think society, based on this, is justified, and I think we are doing the best thing we possibly can do for Miss Nyberg under these conditions, to rehabilitate herself. You have a full and complete lige [sic] in the future. So based on all these hearings in and out of Chambers, whatever was said here today, there will be a plea of guilty, finding of guilty, judgment on the finding. Sentence will be five to twenty years in the Womens State Penitentiary. That's all."

■■ Our decision to reverse and remand is based on our agreement with defendant's contention that there was no factual basis for the plea. Supreme Court Rule 402(c) (Ill. Rev. Stat. 1971, ch. 110A, par. 402(c)) provides that "[t]he court shall not enter final judgment on the plea of guilty without first determining that there is a factual basis for the plea." The reason for the rule is to protect the defendant from pleading guilty to a crime which his acts and mental state do not constitute. *People v. Hudson*, 7 Ill.App.3d 800, 288 N.E.2d 533.

The reason for the rule is well served in this case. Here, we have a young woman with limited intellectual capacity and with apparently no previous experience with the criminal justice system. At the hearing on the change of plea, it was her appointed counsel who stated that she plead guilty generally, that she could not have murdered the child, and that the only way she could have harmed her child was if he had provoked her. The court asked the defendant if she stipulated to this. She responded yes. We question the ability of the defendant to under-

stand the meaning of the word "stipulate." But even more importantly, the words of her appointed counsel have the curious ring of the words of the statute defining the offense of voluntary manslaughter. (Ill. Rev. Stat. 1971, ch. 38, par. 9—2(a).) Certainly nothing in the record indicates that her conduct fits into this category. There is neither evidence nor suggestion that she was acting under a sudden and intense passion resulting from serious provocation, as the statute requires. The statute defines serious provocation as "conduct sufficient to excite an intense passion in a reasonable person." In *People v. Crews*, 38 Ill.2d 331, 336, 231 N.E.2d 451, 453, the supreme court stated: "The doctrine of provocation is a compassionate one, based on a recognition of human frailty. It is ludicrous, however, to suggest that a 'reasonable person' could have been provoked by the actions of a 2 year-old child. The contention has no merit." The point is equally well taken in the instant case where a 4½-month-old child is involved.

■■ Rule 402 requires substantial compliance with its provisions. From the point of view of the trial judge, he may use any portion of the record to satisfy himself that a factual basis exists. (*People v. Kinsley*, 10 Ill. App.3d 326, 293 N.E.2d 627.) Usually the judge will examine portions of the record, such as trial testimony, statements of defendant, stipulations of counsel, or presentence reports, in order to make a determination. Moreover, it has been held that if the judge explicitly states on the record that he is satisfied that a factual basis exists, based on his examination of certain sources, this is a sufficient determination, even though the record itself does not show the facts underlying his determination. (*People v. Doe*, 6 Ill.App.3d 799, 286 N.E.2d 645.) After carefully and thoroughly reviewing the record in the instant case, we find it insufficient to sustain a guilty plea to any grade of homicide.

■ The State contends that defendant's in-court statement that the only way she could have possibly harmed her child would have been if her child had provoked her or did something to make her angry, combined with the extrajudicial statement that she "did it," is sufficient to provide a factual basis for the plea. We do not agree. The standard of proof necessary to sustain a factual basis for a guilty plea is less than that required to support a conviction after trial. (*People v. Arnold*, 18 Ill.App.3d 95, 309 N.E.2d 406.) Just how much less is difficult to articulate. However, counsel's statement at the change of plea hearing was not an unequivocal declaration that defendant did harm her child. Similarly, the bald statement, "I did it," without any more detail, in light of defendant's statement that she may have been trying to protect her boyfriend, does not connect defendant's acts and mental state with the acts and mental state which constitute the crime. Compare *People v.*

*Logan,* 16 Ill.App.3d 1000, 307 N.E.2d 169, and *People v. Woods,* 17 Ill.App.3d 835, 308 N.E.2d 856, with *People v. Arnold,* 18 Ill.App.3d 95, 309 N.E.2d 406, and *People v. Mangual,* 19 Ill.App.3d 172, 311 N.E.2d 189.

■■ Equally distressing to us is the failure of the record to show that death was caused by a criminal agency. There was no expert medical testimony as to cause of death. The State indicated at one point in its case-in-chief that Dr. Kearns, a coroner's pathologist, would be called to testify. If he did testify, there is no indication in the record what his opinion was as to cause of death. Even without medical testimony there was no showing of what acts defendant did in order to kill the infant, from which the cause of death could be inferred. From all that appears in the record, the infant may have succumbed to "sudden unexpected crib death,"[1] as defendant suggests. The State argues that the hearsay testimony of a police officer that the death was "unnatural" is sufficient to show that death was caused by a criminal agency. We think that it would be prejudicial in this murder prosecution to rely on proof of this nature to establish a factual basis for the plea.

In conclusion, we find that the trial court committed reversible error in entering judgment without adequately determining that a factual basis existed for the plea of guilty. Accordingly, we reverse the judgment of the circuit court of Cook County, and remand the cause with directions to allow defendant to plead anew. Under these circumstances we need not consider the other contentions on appeal.

Reversed and remanded with directions.

MEJDA, J., concurs.

Mr. PRESIDING JUSTICE McNAMARA dissenting:

I must respectfully dissent. I believe that there was a factual basis for defendant's plea of guilty.

Supreme Court Rule 402(c) provides:

> "The court shall not enter final judgment on a plea of guilty without first determining that there is a factual basis for the plea."

The Committee Comments regarding Rule 402(c) state:

> "Such inquiry is not uncommon in current practice, but heretofore has not been specifically required by law. The language of paragraph (c) is based upon the recent revision of Rule 11 of the

---

[1] For a discussion of this medical phenomenon, see Curran, *An Enigma Wrapped in Swaddling Clothes: Congress and "Crib Death,"* 287 New Eng. J. Med. 235 (1972); Letters on Medical Examiners and Infant Deaths, 287 New Eng. J. Med. 1050 (1972).

Federal Rules of Criminal Procedure, and, as is true under the Federal rule, no particular kind of inquiry is specified; the court may satisfy itself by inquiry of the defendant or the attorney for the government, by examination of the presentence report, or by any other means which seem best for the kind of case involved." S.H.A. ch. 110A, Committee Comment to § 402(c) (pocket part 1974).

The quantum of proof necessary to determine that there is a factual basis for the plea of guilty is less than that necessary to sustain a conviction after a full trial. The reasonable doubt standard is inapplicable. (*People v. Hudson* (1972), 7 Ill.App.3d 800, 288 N.E.2d 533; *People v. Arnold* (1974), 18 Ill.App.3d 95, 309 N.E.2d 406.) Indeed, in *Hudson*, cited by the majority, the court went so far as to hold that the standard for a factual basis was not even a preponderance of evidence that defendant committed the offense, so long as there was a basis for the court to connect defendant's acts and intent with which he acted and the acts and intent required to constitute the offense. (Also see *People v. Ballauer* (1974, No. 59126), 23 Ill.App.3d 711.) This court has also held that a trial judge may use any portion of the record, even facts brought out at the hearing in aggravation and mitigation after acceptance of the plea, to find a factual basis for the plea. *People v. Warship* (1972), 6 Ill.App.3d 461, 285 N.E.2d 224; *People v. Kinsley* (1973), 10 Ill.App.3d 326, 293 N.E.2d 627.

In the present case, after 2 or 3 days of trial, but before the State had rested, the trial court had heard three witnesses testify concerning defendant's extrajudicial confession of guilt. The court had also heard defendant's in-court statement through counsel that the only way she could have possibly harmed her child would have been if her child had provoked her or had done something to make her angry. These facts appear to me to more closely comply with the mandate of Rule 402(c) than the facts found in our per curiam decision in *Kinsley*. In holding that the trial court had substantially complied with that provision of the rule in that case, we noted that when defendant had been asked by the trial judge if he had in fact shot his wife, he answered "I must have  *  *  *  [p]eople said I did. I had the gun, and she said, 'Oh, my God, I am dying.'"

While, in a trial, a corpus delicti must be proved, independent of a confession, beyond a reasonable doubt, it need not be proved beyond a reasonable doubt nor independent of a confession where the judicial inquiry is one of factual basis for a guilty plea. The Committee Comments on Rule 402(c) make clear that an admission by defendant is sufficient to establish a factual basis for a plea. Under the Rule, the evidence of

marks on the victim's head and the testimony, although hearsay, that the cause of death was "unnatural" also could be considered by the judge in determining a factual basis. In my judgment, there was an adequate factual basis for defendant's plea of guilty to voluntary manslaughter. There was substantial compliance with the requirements of Rule 402(c), and I would affirm the judgment of the circuit court of Cook County.