729 N.E.2d 86 (2000)
313 Ill. App.3d 205
246 Ill.Dec. 86
In re M.H. and T.H., Minors (The People of the State of Illinois, Petitioner-Appellee
v.
V.D., Respondent-Appellant).
No. 2-99-0864.
Appellate Court of Illinois, Second District.
April 25, 2000.
*88 Donald P. Sullivan (Court-appointed), Rockford, for V.D.
Paul A. Logli, Winnebago County State's Attorney, Rockford, Martin P. Moltz, Deputy Director, State's Attorneys Appellate Prosecutor, Elgin, Sally A. Swiss, Wheaton, for the People.
Presiding Justice BOWMAN delivered the opinion of the court:
Respondent, V.D. (respondent), appeals from the trial court's termination of her parental rights with respect to her two daughters, M.H. and T.H. Respondent argues that (1) the State failed to prove she was unfit by clear and convincing evidence and (2) her admission of unfitness was involuntary and contrary to public policy. We reverse the trial court's judgment and remand for further proceedings.
Respondent has six children. This appeal involves respondent's rights only with respect to T.H. and M.H. On May 1, 1995, the State filed petitions alleging that T.H. and M.H. were neglected minors because one of their brothers occasionally set things on fire, thus placing T.H. and M.H. at risk of harm. Respondent admitted the petitions and, on August 1, 1995, the trial court declared T.H. and M.H. to be neglected minors and wards of the court. In its order of disposition, the trial court appointed Department of Children and Family Services (DCFS) as the girls' guardian and custodian and allowed them to be released to respondent. The court further ordered that (1) no other persons could live in respondent's home without prior approval from DCFS; (2) respondent's son, J.H., must receive counseling; (3) respondent must attend parenting class and counseling; (4) respondent must maintain a safe and clean home; (5) no alcohol could be consumed around the children; and (6) no one who was intoxicated was allowed in the home.
On or around February 13, 1996, respondent's children were removed from her custody because of poor conditions in their home. T.H., M.H., and their brother, J.H., were placed with their aunt. Later, M.H. and T.H. were placed with different foster parents. Eventually it came to light that T.H. had been sexually abused by her brother, S.H., and M.H. had been sexually abused by her brother, J.H. The record is *89 silent as to when the abuse occurred and when respondent and DCFS learned of the abuse.
During the pendency of this matter, the court entered the following orders: the minors' parents and relatives were not to discuss child abuse and neglect issues with the minors; respondent's son, S.H., could have no unsupervised contact with his siblings or with respondent; respondent must cooperate in a psychological evaluation; and no one was to threaten or harass the caseworkers. The court entered this last order in response to reports that members of respondent's family had been harassing caseworkers.
Prior to the termination of respondent's parental rights as to T.H. and M.H., respondent was before the court numerous times for proceedings related to her children. On February 25, 1998, the trial court conducted an adjudicatory hearing on the State's petition to have respondent's youngest son declared an abused minor. During the hearing, respondent's counsel stipulated that M.H. and T.H. had been sexually abused by their brothers and respondent had not been able to protect them. The State introduced evidence that respondent recently had become romantically involved with B.D., who had been convicted of the aggravated sexual assault of a 13-year-old girl.
The State also introduced evidence that respondent allowed her brother to use cocaine in her home. There was conflicting evidence regarding whether respondent's youngest son was present while her brother was using cocaine. There was further evidence that on several occasions respondent's son, S.H., had run away from his foster placement to respondent's home and respondent had not informed DCFS of S.H.'s presence in her home. A family caseworker from Catholic Charities testified that respondent's protective skills were poor and she did not exercise good judgment concerning whom she allowed around her children.
On July 9, 1998, the State filed a "Supplemental Petition for Termination of Parental Rights and Power to Consent to Adoption" (supplemental petition) with respect to both T.H. and M.H. The supplemental petitions appear to be forms with blanks for dates and the parties' names. The supplemental petitions alleged that respondent was unfit to have a child because:
"COUNT I:
She has failed to maintain a reasonable degree of interest, concern, or responsibility as to the said minor's welfare.
COUNT II
She has failed to protect the said minor from conditions within Minor's environment which are injurious to the child's welfare.
COUNT III
She failed to make reasonable efforts to correct the conditions which were the basis of the removal of the said minor from her, or to make reasonable progress toward the return of the minor to her within 12 months after an adjudication of a neglected Minor und [sic] under Illinois Revised Statutes, ILCS705 [sic], Section 405/2-3."
The supplemental petitions also sought to terminate the rights of T.H.'s father and M.H.'s father.
The trial on the termination of respondent's parental rights was scheduled for January 20, 1999. On that date, the State indicated it would dismiss the petition to terminate respondent's parental rights as to her son, J.H., because J.H. did not want to be adopted. The State also informed the court that it would not seek to terminate respondent's parental rights with respect to her youngest son. The State went on to advise the court that respondent agreed to admit to the allegations in count III of the supplemental petitions that she was unfit for failing to make reasonable progress toward the return of M.H. and T.H. The State further advised that it would try to work out an open *90 adoption for T.H. and M.H. that would allow respondent to remain in contact with her daughters. Respondent's attorney represented that he had thoroughly discussed the matter with respondent. The court then questioned respondent on whether she understood her right to require the State to prove her unfit:
"THE COURT: Okay. I want to be clear on the record, [V.D.], that you have a right of requiring the State prove the allegations, including the allegations that you failed to make reasonable progress on your service plan, that the State has a very high burden of proof, they can demonstrate by clear and convincing evidence that you failed to follow through or failed to progress, basically, in terms of meeting your service plan goals, finishing whatever classes or counseling that was required in order that [M.H.] and [T.H.] can be returned to you. Do you understand that you have the right to require that the State present a trial, and if you agree to this you are giving up your right to that?
[RESPONDENT'S ATTORNEY]: [V.D.]?
THE COURT: Did you want to take a moment to talk to your attorney more? You are hesitating, so I don't want to beThis is a big step and I want you to be comfortable with it, and I want your [sic] to understand what's being said. What I understand is if you admit to this then the question becomes, at the point in time we set the second portion of it. It's a two-part consideration, first the unfitness issue and then what's in the best interests, and before anything would be done affecting your parental rights findings would have to be made. It would have to be found it would not be in the children's best interests to go home with you, or whatever, but the first part iswhat we are talking about todayand you do have the right to require the State to prove that you are unfit, so if you give up that right I just want that to be made with your understanding and your agreement. Do you understand that?
THE MOTHER: Yeah.
THE COURT: Are you agreeable to that?
THE MOTHER: Yeah."
The court then accepted respondent's admissions on count III of the supplemental petitions. The parties conducted a prove-up on the issue of whether T.H.'s father and M.H.'s father were unfit. The trial court declared both fathers unfit.
In April and June 1999 the trial court conducted hearings to determine the best interests of T.H. and M.H. Ann Gerber, a family caseworker, testified that T.H. went back and forth between wanting to be adopted by her foster family and wanting to return to her mother. According to Gerber, M.H. wanted to stay with her foster family permanently.
Gerber did not want to work toward returning T.H. and M.H. to respondent because she felt respondent had made minimal progress toward improving her parenting skills. According to Gerber, most of respondent's counselors felt that she was either unable or unwilling to discuss the sexual abuse that happened to T.H. and M.H. Gerber said, "She discusses [the sexual abuse issues] now, but she still has a hard time understanding how this has affected her children and how she would have to protect them in the future from it occurring again." In Gerber's opinion, it was in the children's best interests to free them for adoption.
Gerber testified further that, when she observed family visits, respondent had a hard time interacting with T.H. and M.H. Although respondent was happy to see the children and sometimes gave them a hug, there was little other interaction between them.
Gerber indicated that respondent had completed Catholic Charities' parenting class twice. However, Gerber and the parenting class coordinator did not see much improvement in respondent's parenting *91 skills. Gerber was also aware that respondent was attending counseling both individually and with her husband, B.D.
Respondent testified that, in the past four years, things had gone "not so good." She felt she had made "a little bit" of progress. When asked what progress she had made, respondent replied, "[p]arenting classes but not good enough I guess, counseling." Respondent felt that her house was appropriate for the children. Regarding her visits with the children, respondent testified she did not like people watching her every move. She said that a long time ago a caseworker had told her not to hug the children during visits. She preferred visiting her children in her house as opposed to at Catholic Charities. She explained that she did not want to do too much in the way of interacting with her children because she would probably get in trouble for it.
Respondent testified that her counseling sessions were going "fine." She had addressed the sexual abuse issues with her counselor "a little bit but not much." She testified that she felt remorse for what happened to T.H. and M.H. She further testified that she understood the seriousness of what happened and felt like she could adequately protect T.H. and M.H. from further abuse. Respondent stated that she wanted her children to come home because she loved them and wanted them back. She said she felt competent to take care of them.
On cross-examination, respondent was asked what skills she acquired through her parenting classes and counseling that would help her protect her children. Her answer was not responsive to the question and when asked again, she gave no response.
The next witness was Kathy Olson, the services director of Regional Access and Mobilization Project (RAMP). Olson became involved with respondent pursuant to a request from Catholic Charities to work with respondent on her independent living skills. Olson had visited respondent's home every two weeks since November 1998. She stated that respondent's home was always clean and in good order. Respondent's youngest child, C.D., who lived with respondent and her husband, was always clean and healthy and appeared happy. Olson worked with respondent on interacting more with C.D. Olson testified that respondent's mothering skills with respect to C.D. had increased during the previous six months. Olson did not feel qualified to give an opinion as to whether respondent and her husband could provide a stable home for respondent's other children, although Olson thought they were financially able to do so; their house was clean and they had adequate food. Olson was present for four of respondent's visits with T.H. and M.H. She thought the visits went well, although she told respondent that she wished she would interact more with the children. Olson felt respondent then made more of an effort to interact.
On cross-examination, Olson testified that she was not a child-care professional. She explained that RAMP employees have training in advocacy and providing independent living skills to people with disabilities. She had been working with respondent primarily on verbalizing her concerns and feelings with respect to getting her children back. Olson stated that respondent did not feel like she had been able to say what she wanted to say in the court proceedings. Respondent felt she had been getting lost in the shuffle of different attorneys and different guardians assigned to the case.
Ann Gerber, a foster care case manager with Catholic Charities, testified that she had been working with respondent's family since October 1998. Gerber testified that, during a visit that took place on May 18, 1999, the interaction she saw between respondent and the children was appropriate. She did not notice a major improvement in respondent's interaction with the children during the time she worked on *92 the case, but she saw a little more interaction during some visits.
B.D., respondent's husband and the father of respondent's youngest child, testified that he has been in counseling for the past 23 months related to his criminal sexual assault conviction. He was required to go to counseling as a condition of his parole, but he planned to continue counseling after his parole expired because he found it helpful. As a result of his counseling, he learned not to put himself in situations where he would be in danger of committing another offense. He did not think there was a risk of him committing another offense. He testified that he stopped using drugs and drinks alcohol only on holidays but does not get drunk. He has had a steady job for 1½ years. B.D. testified that he loved T.H. and M.H.
On July 7, 1999, the trial court ruled that it was in the best interests of T.H. and M.H. to free them for adoption. The court stated that it would not be appropriate to return them to their mother's care because a substantial number of issues still had to be resolved. The court did not specify the "substantial issues" that remained unresolved. Respondent's timely appeal ensued.
We first consider respondent's argument that the State failed to prove her unfit by clear and convincing evidence. Parental rights of a nonconsenting parent may only be terminated upon an adjudication of unfitness. In re S.G., 216 Ill. App.3d 668, 669, 159 Ill.Dec. 125, 575 N.E.2d 932 (1991). The termination of one's parental rights is one of the most "drastic and permanent" actions a court can take. S.G., 216 Ill.App.3d at 671, 159 Ill.Dec. 125, 575 N.E.2d 932. Because terminating parental rights has a devastating effect upon the parent-child relationship, the evidence of a parent's unfitness has to be clear and convincing. In re Adoption of Syck, 138 Ill.2d 255, 275, 149 Ill.Dec. 710, 562 N.E.2d 174 (1990); see also Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Just because a court has found a mother unfit to have custody of her children, it does not automatically follow that she is unfit to be their mother with attendant rights and privileges. In re Hurley, 44 Ill.App.3d 260, 266, 2 Ill.Dec. 595, 357 N.E.2d 815 (1976).
Respondent asserts that her admission that she failed to make reasonable progress toward the return of T.H. and M.H. was insufficient to prove her unfit by clear and convincing evidence because the trial court did not have any facts before it to support the admission. In our view, the precise question we must resolve is not whether the State failed to prove respondent unfit by clear and convincing evidence but whether, when respondent made the admission of unfitness, the trial court was required to determine whether a factual basis existed for the admission before accepting it.
Before reaching the merits of respondent's first argument, we address the appropriate standard of review. Ordinarily, a trial court's ruling regarding a parent's fitness is entitled to great deference because the trial court had the opportunity to observe the witnesses and evaluate their testimony. In re Clarence T.B., 215 Ill. App.3d 85, 100, 158 Ill.Dec. 765, 574 N.E.2d 878 (1991). Under such circumstances, a reviewing court will not disturb the trial court's ruling unless it is against the manifest weight of the evidence. Clarence T.B., 215 Ill.App.3d at 100-01, 158 Ill.Dec. 765, 574 N.E.2d 878. In this case, however, the trial court's finding that respondent was unfit was based not upon testimony or other evidence but upon respondent's admission to part of count III of the State's supplemental petitions to terminate her parental rights. The question of whether the trial court was required to determine that respondent's admission had a basis in fact is one of law. Thus, our review is de novo. Woods v. Cole, 181 Ill.2d 512, 516, 230 Ill.Dec. 204, 693 N.E.2d 333 (1998).
*93 Respondent suggests that the State should have provided the court with a statement of facts supporting the admission, as the State sometimes does under Supreme Court Rule 402(c) (177 Ill.2d R. 402(c)) when a criminal defendant enters a guilty plea. Rule 402(c) provides that "[a] court shall not enter final judgment on a plea of guilty without first determining that there is a factual basis for the plea." 177 Ill.2d R. 402(c).
The State argues that Rule 402(c)'s requirements do not apply outside of criminal proceedings and the termination of parental rights is not analogous to a criminal proceeding. We agree with the State that Rule 402(c) does not directly apply to admissions of parental unfitness. We do not agree with the assertion that proceedings to terminate parental rights are not analogous to criminal proceedings. Further, we conclude that the same precautionary concerns that led to the requirements of Rule 402(c) apply to admissions of unfitness in proceedings to terminate parental rights.
In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court noted that "the factfinding stage of a state-initiated permanent neglect proceeding bears many of the indicia of a criminal trial." Santosky, 455 U.S. at 762, 102 S.Ct. at 1399, 71 L.Ed.2d at 612. The Court in Santosky examined parental rights termination proceedings in the State of New York. The Court listed the following elements of a New York parental rights termination proceeding that resemble a criminal trial:
"The Commissioner of Social Services charges the parents with permanent neglect. They are served by summons. [Citation.] The factfinding hearing is conducted pursuant to formal rules of evidence. [Citation.] The State, the parents, and the child are all represented by counsel. [Citation.] The State seeks to establish a series of historical facts about the intensity of its agency's efforts to reunite the family, the infrequency and insubstantiality of the parents' contacts with their child, and the parents' inability or unwillingness to formulate a plan for the child's future. The attorneys submit documentary evidence, and call witnesses who are subject to cross-examination. Based on all the evidence, the judge then determines whether the State has proved the statutory elements of permanent neglect * * *." Santosky, 455 U.S. at 762, 102 S.Ct. at 1399, 71 L.Ed.2d at 612.
Proceedings in Illinois to terminate parental rights contain all of the elements the Supreme Court referred to in Santosky. See 705 ILCS 405/1-5, 2-13, 2-15, 2-18, 2-21(5) (West 1998).
The State argues that an admission of unfitness, unlike a guilty plea, does not by itself lead to a final judgment with consequences adverse to the person making the admission. While this is true, a finding of unfitness has a substantial adverse impact upon a parent in a proceeding to terminate his or her rights. Under Illinois law, a finding of unfitness is a prerequisite to a hearing to determine a child's best interests. Syck, 138 Ill.2d at 276, 149 Ill.Dec. 710, 562 N.E.2d 174. Additionally, the State can use an admission of unfitness as evidence that adoption, rather than return to the natural parent, is in the child's best interest. The import of a finding of unfitness is also reflected in the Santosky decision, which elevated the burden of proof necessary to support a finding of unfitness to clear and convincing evidence. Santosky, 455 U.S. at 769, 102 S.Ct. at 1403, 71 L.Ed.2d at 617.
The State also argues that, if anything, respondent's admission of unfitness was more like a stipulated bench trial than a guilty plea and, as such, no guilty plea admonishments were necessary. See People v. Hawkins, 213 Ill.App.3d 53, 54, 157 Ill.Dec. 158, 571 N.E.2d 1177 (1991). The problem with this argument is that in stipulated bench trials defendants are entitled to present evidence and the State still *94 must prove defendants' guilt beyond a reasonable doubt. See People v. Horton, 143 Ill.2d 11, 17, 155 Ill.Dec. 807, 570 N.E.2d 320 (1991). Also, if a defendant in a stipulated bench trial stipulates that the evidence was sufficient to convict him, he is entitled to Rule 402(c) admonishments, just like a defendant who pleads guilty. Horton, 143 Ill.2d at 22, 155 Ill.Dec. 807, 570 N.E.2d 320. Here, respondent could not present any evidence in her defense after she admitted she was unfit. Moreover, once respondent admitted she was an unfit parent, the State was relieved of its burden to prove her unfit by clear and convincing evidence. In our view, an admission of unfitness is clearly analogous to a guilty plea in a criminal case. Accordingly, we reject the State's arguments.
Also, fundamental liberty interests are at stake in parental rights termination proceedings, and dire consequences can result if the State succeeds in proving its case. In Lassiter v. Department of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the Supreme Court declared:
"This Court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to `the companionship, care, custody, and management of his or her children' is an important interest that `undeniably warrants deference and, absent a powerful countervailing interest, protection.' [Citation.] * * * If the State prevails, it will have worked a unique kind of deprivation. [Citations.] A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." Lassiter, 452 U.S. at 27, 101 S.Ct. at 2159-60, 68 L.Ed.2d at 649-50, quoting Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972).
Considering these significant interests, we conclude that the protection afforded by requiring trial courts to determine that a factual basis exists for an admission of unfitness is necessary.
Illinois courts have held that admissions made in proceedings under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 et seq. (West 1998)) must be intelligent and voluntary to be valid. In re Johnson, 102 Ill.App.3d 1005, 1012-13, 58 Ill.Dec. 31, 429 N.E.2d 1364 (1981); In re Moore, 87 Ill.App.3d 1117, 1121-22, 42 Ill. Dec. 820, 409 N.E.2d 435 (1980). Relying on Moore and In re Beasley, 66 Ill.2d 385, 6 Ill.Dec. 202, 362 N.E.2d 1024 (1977), the court in Johnson held:
"for the admission of a parent to be valid in the adjudicatory phase of a neglect proceeding, it must be apparent from the record that the parent making the admission understood the consequences of his admissionthat a finding of neglect gives the court jurisdiction of the minor who then becomes subject to the dispositional powers of the court." Johnson, 102 Ill.App.3d at 1012-13, 58 Ill.Dec. 31, 429 N.E.2d 1364.
If an admission of neglect must be knowing and voluntary, an admission of unfitness, which carries with it more permanent and severe consequences, must also be knowing and voluntary.
In our view, a determination that a factual basis exists for an admission of unfitness is necessary to insure that a parent's admission is knowing and voluntary. Otherwise there is a danger that a parent may understand the State's alleged grounds of unfitness but may not realize that his or her conduct does not fall within those allegations. See People v. Quick, 24 Ill.App.3d 286, 289, 320 N.E.2d 335 (1974), citing McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969). Because of the dire consequences of a finding of parental unfitness, it is important for the trial court to insure that an admission of unfitness is made intelligently and voluntarily. The burden on courts of conducting an inquiry into the factual basis for an admission of unfitness will be minimal. As we discuss in more detail below, *95 courts can use a number of different methods to satisfy themselves that an admission has a basis in fact.
In keeping with our analogy to a guilty plea situation, we further hold that the factual basis that is required before the court may accept an admission of unfitness need not rise to the level of the State's burden of proof, which in this case is clear and convincing evidence. See People v. Nyberg, 24 Ill.App.3d 41, 48, 320 N.E.2d 546 (1974) (holding that the quantum of proof necessary to sustain a factual basis for a guilty plea is less than that required to prove a defendant guilty beyond a reasonable doubt at trial). Additionally, the trial court may determine the best method for ascertaining whether a sufficient factual basis exists. We are guided by the committee comments to Rule 402(c), which provide that "no particular kind of inquiry is specified; the court may satisfy itself by inquiry of the defendant or the attorney for the government, by examination of the presentence report, or by any other means which seem best for the kind of case involved." 177 Ill.2d R. 402(c), Committee Comments, at lxxvii. Whatever the method, though, in our view a trial court cannot determine whether a parent made reasonable progress toward the return of his or her children without first knowing the goals the parent was supposed to work toward and what efforts, if any, the parent made toward reaching those goals.
Here, there is no indication in the record that the trial court had any such facts before it when respondent admitted her unfitness. The State's supplemental petitions contained only general allegations that respondent failed to make reasonable progress and lacked any facts specific to respondent. No additional facts were presented at the time of the admission.
The State contends the trial court heard sufficient evidence to support respondent's admission during the February 1998 adjudicatory hearing for respondent's youngest son as well as during the subsequent best interests hearing. Under the supreme court's recent ruling in In re D.L., No. 86161, 191 Ill.2d 1, 245 Ill.Dec. 256, 727 N.E.2d 990 (2000), it would be improper for the trial court to use the evidence presented at these two hearings as the factual basis supporting respondent's admission of unfitness. In D.L., the supreme court interpreted section 1(D)(m) of the Adoption Act, which provides that a parent may be found unfit for:
"Failure * * * to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child to the parent within 12 months after an adjudication of neglected minor, abused minor or dependent minor under the Juvenile Court Act or the Juvenile Court Act of 1987." 750 ILCS 50/1(D)(m) (West 1994).
The court held that section 1(D)(m) "limits the evidence that may be considered under the provision to matters concerning the parent's conduct in the 12 months following the applicable adjudication of neglect, abuse, or dependency." D.L., 191 Ill.2d at 10, 245 Ill.Dec. 256, 727 N.E.2d 990.
Respondent here admitted that she failed to meet the requirements of section 1(D)(m) because she did not make reasonable progress toward the return of her children during the 12 months following their adjudication of neglect. T.H. and M.H. were adjudicated neglected minors on August 1, 1995. According to the reasoning in D.L., if the trial court had conducted a hearing to determine whether respondent failed to make reasonable progress, the trial court could have considered only evidence concerning respondent's conduct between August 1, 1995, and August 1, 1996. Likewise, we hold that, when determining whether a factual basis existed for respondent's admission of failure to make reasonable progress, the *96 trial court should be able to look only to evidence of respondent's conduct during the 12 months following the adjudication of neglect. To hold otherwise would be inconsistent with D.L. Consequently, it would be inappropriate for us to consider the evidence the State suggests, which was presented at hearings that took place in 1998 and 1999 and did not address respondent's conduct between August 1995 and August 1996. As the court stated in D.L., evidence of a parent's conduct occurring after the 12-month statutory period may be presented at a subsequent best interests hearing if a parent is found unfit. D.L., 191 Ill.2d at 8, 245 Ill.Dec. 256, 727 N.E.2d 990.
We conclude that respondent's admission of unfitness was invalid because the court did not determine that a factual basis existed for the admission. Consequently, we vacate respondent's admission of unfitness, reverse the order terminating respondent's parental rights as to T.H. and M.H., and remand this cause for a new hearing to determine whether respondent is unfit to parent T.H. and M.H. In view of this determination, we need not consider respondent's second contention that her admission was unknowing, involuntary, and contrary to public policy.
Upon remand, if respondent is found unfit, the court should conduct a new best interests hearing. The previous best interests hearing took place almost one year ago and in the intervening months the children's best interests may have changed. In so instructing, we offer no opinion as to respondent's fitness as a parent or what the children's best interests may be.
Accordingly, the judgment of the circuit court of Winnebago County is reversed, and the cause is remanded for proceedings consistent with this court's ruling.
Reversed and remanded.
McLAREN and GALASSO, JJ., concur.